

# The University of the State of New York

## The State Education Department
### State Review Officer
**www.sro.nysed.gov**

**No. 24-026**

**Application of a STUDENT WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

The Law Office of Elisa Hyman, PC, attorneys for petitioners, by Erin O'Connor, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Ezra Zonana, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from the decision of an impartial hearing officer (IHO) which denied their request to be reimbursed for their daughter's tuition costs at Gesher Early Childhood Center (Gesher) and for vision therapy services for the 2023-24 school year. Respondent (the district) cross-appeals from the IHO's order directing it to reconvene its Committee on Special Education (CSE) to determine the student's need for vision therapy and other related services. The appeal must be sustained in part. The cross-appeal must be sustained in part.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C.

EXHIBIT C - 1

§§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]).  First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]).  An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]).  The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]).  A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]).  The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]).  The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4).  The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5).  The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]).  The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

## III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited here in detail.  On January 10, 2023, the student underwent a private visual perceptual evaluation to determine whether she would benefit from vision therapy to improve her academic functioning (see generally Parent Ex. B).  The student additionally underwent a private neuropsychological evaluation in May 2023 (see generally Parent Ex. E).  The student has received diagnoses of a genetic disorder resulting in developmental delays, low muscle tone and drooping left eye; attention deficit hyperactivity

EXHIBIT C - 2

disorder (ADHD), inattentive type; unspecified communication disorder; developmental coordination disorder; oculomotor dysfunction; fusional instability/eye teaming difficulties; accommodative infacility; and visual motor integration deficits (Parent Exs. B at pp. 1-2; C at p. 1; E at pp. 1, 16-18).

A CSE convened on June 26, 2023, to formulate an IEP for the student for the 2023-24 school year (first grade) (see generally IHO Ex. I).  The June 2023 CSE found the student eligible for special education services as a student with an other health-impairment and recommended a program of integrated co-teaching (ICT) services in math, English language arts (ELA), social studies, and science, together with related services of one 30-minute session per week of individual counseling, three 30-minute sessions per week of individual occupational therapy (OT), one 30-minute session per week of individual physical therapy (PT), and two 30-minute sessions per week of individual speech-language therapy (IHO Ex. I at pp. 15-16, 21-22).[1]

In a due process complaint notice, dated September 7, 2023, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2023-24 school year (see Parent Ex. A).  More particularly, the parents alleged that the district failed to conduct appropriate evaluations of the student, failed to recommend 1:1 special education itinerant teacher (SEIT) services, vision therapy, and a small class, and that the CSE predetermined the student's recommendations (Parent Ex. A at pp. 1, 3, 7, 9-10).[2]  As relief, the parents sought, among other things, provision of full-day 1:1 SEIT services and direct payment/tuition reimbursement for Gesher for the 2023-24 school year (id. at p. 12).

After a prehearing conference on October 10, 2023, and a status conference on October 12, 2023, an impartial hearing convened before the Office of Administrative Trials and Hearings (OATH) on November 2, 2023 (Tr. pp. 1-102).[3]  On October 17, 2023, the IHO issued an interim decision finding that the student's pendency services were based on a November 24, 2021 IEP (see Interim IHO Decision; see generally IHO Ex. III).  In a final decision dated December 11, 2023, the IHO determined that the district failed to offer the student a FAPE for the 2023-24 school year but that Gesher was not an appropriate unilateral placement for the student, that equitable considerations did not favor the parents' request for relief, and that the student was entitled to

---

[1] The student's eligibility for special education services as a student with an other health-impairment is not in dispute (see 34 CFR 300.8[a][9]; 8 NYCRR 200.1[zz][10]).

[2] State law defines SEIT services (or, as referenced in State regulation, "Special Education Itinerant Services" [SEIS]) as "an approved program provided by a certified special education teacher . . . , at a site . . . , including but not limited to an approved or licensed prekindergarten or head start program; the child's home; . . . or a child care location" (Educ. Law § 4410[1][k]; 8 NYCRR 200.16[i][3][ii]; see "[SEIS] for Preschool Children with Disabilities," Office of Special Educ. Field Advisory [Oct. 2015], available at http://www.p12.nysed.gov/specialed/publications/2015-memos/documents/SpecialEducationItinerantServicesforPreschoolChildrenwithDisabilities.pdf; "Approved Preschool Special Education Programs Providing [SEIT] Services," Office of Special Educ. [June 2011], available at http://www.p12.nysed.gov/specialed/publications/SEITjointmemo.pdf).  In addition, SEIT services are "for the purpose of providing specialized individual or group instruction and/or indirect services to preschool students with disabilities" (8 NYCRR 200.16[i][3][ii] [emphasis added]; see Educ. Law § 4410[1][k]). [23-248]

[3] Another status conference was held on December 7, 2023 (Tr. pp. 103-08).

EXHIBIT C - 3

related services of speech-language therapy, PT, and OT (IHO Decision at pp. 3-6, 8, 13-14).  The IHO denied the parents' request for tuition reimbursement for Gesher for the 2023-24 school year (id. at p. 14).  The IHO granted the parents' request for two 30-minute sessions per week of speech-language therapy, one 30-minute session per week of individual PT, and three 30-minute sessions per week of individual OT, all for the 2023-24 school year to be paid at reasonable market rates (id.).  Lastly, the IHO ordered the CSE to reconvene and determine the student's need for vision therapy, increased PT services, and SEIT services (id.).

## IV. Appeal for State-Level Review

The parents appeal, alleging that the IHO erred in finding Gesher was not an appropriate placement for the student, in finding equitable considerations did not favor the parents, and in denying tuition reimbursement for Gesher.  The parents also raise a number of claims related to the conduct of the impartial hearing and the relief requested.  For example, the parents assert that the IHO denied them due process by requiring them to produce the June 2023 IEP as evidence, that proposed additional evidence should be admitted into the hearing record, and that the IHO failed to rule on the parents' claims related to predetermination and Section 504 of the Rehabilitation Act of 1973 (section 504).[4, 5]  The parents also argue that the IHO erred in denying reimbursement for vision therapy services, in failing to award declaratory relief for the 2023-24 school year, and in ordering the CSE to reconvene to determine the student's need for vision therapy services, additional PT services, and SEIT services.  As relief, the parents seek tuition reimbursement for Gesher for the 2023-24 school year, reimbursement of vision therapy services, and a declaratory finding of an appropriate program for the student for the 2023-24 school year.

In its answer, the district generally denies the material allegations contained in the request for review.  The district asserts that the IHO correctly determined that the parents failed to meet their burden to demonstrate that Gesher provided the student with specially designed instruction

---

[4] The district has not cross-appealed from the IHO's determination that the district failed to offer the student a FAPE for the 2023-24 school year.  As a result, this determination has become final and binding on the parties and will not be reviewed on appeal (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).  Given this final and binding determination, I find it unnecessary to examine in detail the merits of each of the parents' allegations relating to the adequacy of the IHO's reasoning underlying the determination that the district denied the student a FAPE, including the IHO's purported failure to make findings about whether the district predetermined the recommended program and services.  Rather, this decision will focus on the parents' specific claims for relief.

[5] The parents also allege that the IHO erred in finding no violation of section 504.  However, an SRO lacks jurisdiction to consider a parent's challenge to an IHO's finding or failure or refusal to rule on section 504, as an SRO's jurisdiction is limited by State law to matters arising under the IDEA and Article 89 of the Education Law (Educ. Law § 4404[2] [providing that SROs review IHO determinations "relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or service and the failure to provide such program"]).  Courts have also recognized that the Education Law makes no provision for State-level administrative review of IHO decisions with regard to section 504 (see A.M. v. New York City Dep't of Educ., 840 F. Supp. 2d 660, 672 & n.17 [E.D.N.Y. 2012] [noting that "[u]nder New York State education law, the SRO's jurisdiction is limited to matters arising under the IDEA or its state counterpart"], aff'd, 513 Fed. App'x 95 [2d Cir. 2013]; see also F.C. v. New York City Dep't of Educ., 2016 WL 8716232, at *11 [S.D.N.Y. Aug. 5, 2016]).  Therefore, an SRO does not have jurisdiction to review any portion of the parent's claims regarding section 504, and accordingly such claims will not be further addressed.

EXHIBIT C - 4

and that equitable considerations weighed against the parents.  In its cross-appeal, the district asserts that the IHO erred in granting the parents' requests for related services recommended in the IEP, as well as the requested vision therapy services, SEIT, and PT services pending a CSE determination.  The district asserts that the parents did not prove that the services were appropriate for the student or that they had a financial obligation for the services.

The parents submitted an answer to the district's cross-appeal arguing that the district waived any arguments and defenses because it failed to participate in the impartial hearing.  The parents also assert that their request for related services was supported by the hearing record.  Lastly, the parents assert that the cross-appeal failed to comply with procedural regulations and, specifically, failed to set forth a "clear and concise statement of the issues presented for review."[6]  The district submits a reply objecting to issues raised for the first time in the parents' answer and objecting to the procedural defenses raised by the parents.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).  "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]).  The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]).  While the

---

[6] State regulations governing practice before the Office of State Review require that the parties set forth in their pleadings "a clear and concise statement of the issues presented for review and the grounds for reversal or modification to be advanced, with each issue numbered and set forth separately," and identify the IHO's "precise rulings, failures to rule, or refusals to rule presented for review" and further specify that "any issue not identified in a party's request for review, answer, or answer with cross-appeal shall be deemed abandoned and will not be addressed by a State Review Officer" (8 NYCRR 279.8[c][2], [4]; see 8 NYCRR 279.4[a]).  Here, the district sufficiently complied with the State regulations of pleading its issues in the verified answer and cross-appeal.  In addition, the parents do not allege that their ability to timely prepare, serve, or file an answer to the cross-appeal was compromised or prejudiced in any way.  Accordingly, there is insufficient basis to dismiss the district's answer and cross-appeal on the grounds asserted by the parents.

EXHIBIT C - 5

Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]).  Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203).  However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189).  "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404).  The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379).  Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).  Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]).  The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192).  The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and

6

EXHIBIT C - 6

provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[7]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. Preliminary Matters

#### 1. Additional Evidence

The parents seek the introduction of additional documentary evidence into the hearing record: a September 7, 2023 due process complaint notice (SRO Ex. A); a July 17, 2023 IHO decision (SRO Ex. B); an email exchange pertaining to the IHO's introduction of the June 2023 IEP into evidence (SRO Ex. C); and a request for review appealing the July 17, 2023 IHO decision (SRO Ex. D).

Generally, documentary evidence not presented at an impartial hearing may be considered in an appeal from an impartial hearing officer's decision only if such additional evidence could not have been offered at the time of the impartial hearing and the evidence is necessary in order to render a decision (see, e.g., Application of a Student with a Disability, Appeal No. 08-030; Application of the Dep't of Educ., Appeal No. 08-024; Application of a Student with a Disability, Appeal No. 08-003; Application of the Bd. of Educ., Appeal No. 06-044; Application of the Bd. of Educ., Appeal No. 06-040; Application of a Child with a Disability, Appeal No. 05-080; Application of a Child with a Disability, Appeal No. 05-068; Application of the Bd. of Educ., Appeal No. 04-068).

---

[7] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom.  The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

EXHIBIT C - 7

Here, the September 7, 2023 due process complaint notice for this proceeding is already in evidence as Parent Exhibit A and it is unnecessary and duplicative to enter the same document into the hearing record.  Therefore, SRO Exhibit A will not be accepted as additional evidence.  The July 17, 2023 decision and appeal of that decision involve a prior proceeding and different school year and are not relevant to the issues on appeal.  Accordingly, both SRO Exhibits B and D will not be accepted as additional evidence.

Next, the emails sought to be introduced as additional evidence pertain to the introduction of the June 2023 IEP into the hearing record.  Some of the emails submitted as additional evidence are already a part of the hearing record (see IHO Ex. II).  State regulation specifically requires that, in addition to exhibits and the transcript of the proceedings, "all briefs, arguments or written requests for an order filed by the parties for consideration by the [IHO]," as well as "all written orders, rulings or decisions issued in the case including an order granting or denying a party's request for an order" are part of the hearing record (8 NYCRR 200.5[j][5][vi]).  Thus, as proposed SRO Exhibit C contains arguments relied on by the IHO in deciding whether to admit the June 2023 IEP, it does not constitute additional evidence presented for the first time on appeal and will be considered herein as its contents fall within the categories required to be made part of the hearing record as per the regulation cited above.

## 2. Conduct of Impartial Hearing

The parents argue that the IHO's directive to produce the June 2023 IEP or "face an adverse inference" was improper.  They argue that the district failed to introduce any evidence into the hearing record but that, after the close of the impartial hearing, the IHO requested the student's last IEP.  The parents also argue that the production of the IEP after the close of evidence was prejudicial and denied them due process as they were not permitted to produce evidence that the June 2023 IEP would not have provided the student with a FAPE.

Unless specifically prohibited by regulations, IHOs are provided with broad discretion, subject to administrative and judicial review procedures, with how they conduct an impartial hearing, in order that they may "accord each party a meaningful opportunity" to exercise their rights during the impartial hearing (Letter to Anonymous, 23 IDELR 1073 [OSEP 1995]; see Impartial Due Process Hearing, 71 Fed. Reg. 46704 [Aug. 14, 2006]).  An IHO must provide all parties with an opportunity to present evidence and testimony, including the opportunity to confront and cross-examine witnesses (34 CFR 300.512[a][2]; 8 NYCRR 200.5[j][3][xii]).  While an IHO is required to exclude evidence and may limit the testimony of witnesses that he or she "determines to be irrelevant, immaterial, unreliable or unduly repetitious" (8 NYCRR 200.5[j][3][xii][c]-[e]), it is also an IHO's responsibility to ensure that there is an adequate and complete hearing record (see 8 NYCRR 200.5[j][3][vii]).  Further, State regulation provides that nothing shall impair or limit the IHO in his or her ability to ask questions of counsel or witnesses for the purpose of clarifying or completing the hearing record (8 NYCRR 200.5[j][3][vii]).

In this matter, the district did not submit any documentary or testimonial evidence and in fact failed to appear for any of the scheduled impartial hearing dates (see Tr. pp. 1-108).  On November 2, 2023, the impartial hearing concluded; however, the IHO left the hearing record "open just in case there [we]re any other clarifying questions or additional evidence that's needed to complete the record" (Tr. pp. 98-99).  On November 19, 2023, the IHO sent an email to the

EXHIBIT C - 8

parties requesting the IEP(s) relevant to the case (SRO Ex. C at p. 1).  In response, parents' counsel stated that the "request [was] prejudicial in nature and object[ed] to the provision and likely consideration of any document at the request of the [IHO] absent an opportunity to review the document beforehand and to be heard on the record as to its authenticity, relevancy and weight in the matter" (id. at p. 2).  Parents' counsel further stated that the district failed to offer any documents and failed to appear at the impartial hearing (id.).  The IHO overruled the parents' objection (id. at pp. 2-3).  When the IHO did not receive any IEP, she sent another email requesting that the district provide any IEP(s) relevant to the matter (id. at p. 6).  Parents' counsel again responded to the email asking the IHO to reconsider the production of the IEP or for the IHO to "limit [her] consideration of the IEP" (id. at pp. 8, 12).  The parents asserted that the district failed to appear, and the hearing record was closed (id. at p. 8).  Additionally, the parents asserted that it was a denial of due process because the parties were not provided the opportunity to be heard on the issue (id.).  In response, the IHO stated in another email that the IEP was necessary "to complete the record and assess the equities" and that the record was still open and not closed at the end of the impartial hearing on November 2, 2023 (Tr. pp. 98-99; SRO Ex. C at p. 10).  The IHO requested compliance with the order directing the production of the student's IEP and requested a date for a status conference for the matter to be discussed on the record (SRO Ex. C at pp. 10, 12).[8]  Thereafter, parents' counsel provided the IHO with the June 2023 IEP (id. at p. 11).

On December 7, 2023, a status conference was held to discuss the IHO's order for production of the IEP (Tr. pp. 104-05).[9]  The parents stated that they were in receipt of the IHO's order directing the production of the IEP and to avoid an "adverse inference" they provided a copy of the IEP with their own notes recorded on it (Tr. pp. 105-06).  The parents stated that they were unable to confirm whether the IEP they produced was the final IEP for the 2023-24 school year as there was no appearance by the district (Tr. p. 106).  The IHO then stated that she would determine the weight given to the IEP based on the concerns raised by the parents (Tr. p. 107).  Ultimately, the IHO admitted the June 2023 IEP into the hearing record as evidence (see generally IHO Ex. I).

The IHO's decision refers to the June 2023 IEP in the background discussion as it summarized to the student's classification and the recommended program and related services (IHO Decision at p. 2; see generally IHO Ex. I).  The IHO found that the district failed to meet its burden of proof because the district failed to submit any evidence into the hearing record and failed to appear at the prehearing conference, status conferences, and impartial hearing on the merits (IHO Decision at pp. 3-4).  Furthermore, the IHO held that the district failed to offer any explanation for the recommendations in the June 2023 IEP, and therefore, failed to meet its burden to prove that it offered the student a FAPE for the 2023-24 school year (id. at p. 5).

In this matter, the IHO properly gave notice to the parties that she wanted the June 2023 IEP for a "complete record" (SRO Ex. C at pp. 1, 6, 10).  The IHO gave the parties the opportunity to be heard (Tr. pp. 103-08).  In keeping with the IHO's directive that there needed to be a complete hearing record, the IHO referenced the June 2023 IEP solely for purposes of background

---

[8] Other than the emails, there is no written order by the IHO for the production of the IEP(s) included in the hearing record on appeal.

[9] The district did not appear for the status conference (Tr. p. 107).

EXHIBIT C - 9

information and made no findings regarding the IEP, other than finding that the district failed to meet its burden to prove that it offered the student a FAPE for the 2023-24 school year (IHO Decision at pp. 3, 5). The parents were given the opportunity to appear and present arguments regarding the inclusion of the IEP in evidence, including a request to present further evidence if they found it necessary, and there was no prejudice to the parents. Lastly, the district does not appeal from the IHO's determination that the district denied the student a FAPE for the 2023-24 school year, and therefore, even if the IHO erred in requiring the production of the June 2023 IEP, any such error would be harmless.

Overall, an independent review of the hearing record demonstrates that the parent had the opportunity to present evidence at the impartial hearing and that the impartial hearing was conducted in a manner consistent with the requirements of due process (see Educ. Law § 4404[2]; 34 CFR 300.514[b][2][i], [ii]; 8 NYCRR 200.5[j]; see generally Tr. pp. 1-108).

### B. Unilateral Placement

On appeal, the crux of the dispute between the parties relates to the appropriateness of the parents' unilateral placement of the student at Gesher for the 2023-24 school year and the parents' unilaterally obtained vision therapy services for the 2023-24 school year.

A private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the student's special education needs (see Gagliardo, 489 F.3d at 112, 115; Walczak, 142 F.3d at 129). A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. at 13-14). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 104 [2d Cir. 2000]). "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement'" (Gagliardo, 489 F.3d at 112, quoting Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 [2d Cir. 2006]; see Rowley, 458 U.S. at 207). Parents need not show that the placement provides every special service necessary to maximize the student's potential (Frank G., 459 F.3d at 364-65). When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits" (Frank G., 459 F.3d at 364; see Gagliardo, 489 F.3d at 115; Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 [6th Cir. 2003] ["evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA"]). A private placement is appropriate if it provides instruction specially designed to meet the unique needs of a student (20 U.S.C. § 1401[29]; Educ. Law § 4401[1]; 34 CFR 300.39[a][1]; 8 NYCRR 200.1[ww]; Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 [2d Cir. 2014]; C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 836 [2d Cir. 2014]; Gagliardo, 489 F.3d at 114-15; Frank G., 459 F.3d at 365).

EXHIBIT C - 10

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits.   Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.  To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential.  They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

(Gagliardo, 489 F.3d at 112, quoting Frank G., 459 F.3d at 364-65).

In addition, the parents' unilaterally obtained vision therapy services must also be assessed under this framework.  That is, a board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Carter, 510 U.S. 7; Burlington, 471 U.S. at 369-70; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).

The parents assert that they met their burden of proof as to the appropriateness of the student's unilateral placement at Gesher.  In particular, the parents argue that the IHO "completely ignored" the testimony of the parent and the SEIT that Gesher met the student's unique needs in "reading comprehension, executive functioning, and maintaining focus" for tasks.  The parents rely on the testimonial evidence that explained how Gesher met the student's unique needs including the "specific strategies and programs" used with the student at Gesher.  Additionally, the parents assert that the small class size and multisensory instruction offered at Gesher is appropriate for the student's needs.

Furthermore, the parents argue that the IHO failed to develop the hearing record with respect to Gesher and the IHO was free to ask questions about the Gesher program and "could have requested additional information from the [p]arents at the time of the hearing."  However, the parents are reminded that it is the parents' burden to develop the hearing record and submit evidence that the student received an educational benefit from the unilateral placement (see Gagliardo, 489 F.3d at 112).

### 1. Student's Needs

While there is no dispute as to the student's educational needs in the instant case, a discussion thereof is necessary in assessing the appropriateness of the parents' unilateral placement and unilaterally obtained vision therapy services.

EXHIBIT C - 11

The May 2023 neuropsychological evaluation administration of the Wechsler Preschool and Primary Scale of Intelligence-Fourth Edition (WPPSI-IV) to the student yielded a full-scale IQ of 75 (Borderline range) (Parent Ex. E at p. 7). The evaluator found that the student's "difficulties with attention and task avoidance likely impacted her ability to show her true potential and because of this, several of her cognitive scores [we]re likely low estimated of her true potential" (id. at p. 16).

The evidence in the hearing record demonstrates that the student exhibited variable performance on formal assessment of academic skills. The May 2023 neuropsychological evaluation report reflected that on the Wechsler Individual Achievement Test-Fourth Edition (WIAT-IV), the student achieved a reading standard score of 90 (25th percentile, average), and reading subtest scores in the average range (Parent Ex. E at pp. 9, 23). On the Test of Early Reading Ability-Fourth Edition, administered as part of the student's March 28, 2023 speech-language evaluation, the student received scores in the average range on the alphabet, conventions, and meaning subtests (Parent Ex. D at p. 13). In addition, the student's October 25, 2023 SEIT progress report noted that "per a recent reading assessment" the student could identify all capital letters and their corresponding sounds and six lower case letters and their corresponding sounds and was beginning to learn sight words (Parent Ex. O at p. 1).

Assessments of the student's math skills yielded variable results. On the math portion of the WIAT-IV the student received a mathematics composite standard score of 76 (5th percentile), which was described as in the very low range (Parent Ex. E at pp. 9, 23). However, on the WIAT-IV math problem solving subtest which "required [the student] to solve untimed math problems related to everyday applications of math in word problems of time, money, counting and identifying data on charts" the student achieved a standard score of 98 (45th percentile), which was described as in the average range (id.). On the numerical operations subtest, on which the student had to "write answers to printed math problems of basic operations appropriate to her grade level," the student did not solve any addition or subtraction problems "on paper with a pencil" and achieved a standard score of 59 (0.3 percentile), which was in the extremely low range (id.). Nonetheless, according to the SEIT progress report, while the student struggled with sustaining attention during math lessons and required "one to one assistance while forming numbers and shapes" her "actual math skills [we]re near grade level" (Parent Ex. O at p. 2).

Speaking to the student's writing skills, the May 2023 neuropsychological evaluation report related that on the WIAT-IV, the student achieved a written expression standard score of 59 (0.3 percentile) (Parent Ex. E at p. 8). The student made "wiggly lines and scribbles" but did not print her name or any letters and the neuropsychologist noted that the student "exhibited pronounced difficulty on tasks within the [w]ritten [e]xpression" area (id.). The student's SEIT progress report related that the student had difficulty with hand/eye coordination and needed "maximal support when writing" (Parent Ex. O at p. 1).

The student's March 2023 OT evaluation revealed delays in gross motor and motor planning skills that included eye-hand coordination as well as body strength, coordination, body awareness (Parent Ex. C at p. 2).[10] The student had delays in fine motor strength and dexterity,

---

[10] The student's September 27, 2023 PT progress report noted that she had difficulty with strength, balance, motor planning, and coordination (Parent Ex. L at p. 2).

EXHIBIT C - 12

coloring, drawing, writing, and scissor skills, which were negatively impacted by her difficulty with self-regulation and environmental distractions (id. at p. 5). Delays in the student's fine motor abilities were also noted in the May 2023 neuropsychological evaluation report, which stated that although the evaluator determined that the student exhibited adequate gross motor skills, she had deficits in fine motor skills and adaptive abilities and met the criteria for developmental coordination disorder (Parent Ex. E at p. 17).

A developmental optometrist evaluated the student's visual perceptual skills on January 10, 2023, and found that the student had difficulty with eye tracking, eye teaming, eye focusing ability, visual motor integration, left/right awareness, and visual spatial awareness (Parent Ex. B at pp. 1-3). The March 2023 OT evaluation report also revealed "significant visual perceptual deficits" and "frequent visual fatigue that impact[ed] [the student's] ability to participate in home and school routines" (Parent Ex. C at pp. 5-6). On the Test of Visual Perceptual Skills-4th Edition (TVPS-4), the student received the following subtest scaled scores: 11 (63rd percentile) on visual discrimination; 7 (16th percentile) on visual memory; 8 (25th percentile) on spatial relationships; 3 (1st percentile) on form consistency; 4 (2nd percentile) on sequential memory; 2 (<1st percentile) on visual figure ground; and 5 (5th percentile) on visual closure (id. at p. 7). The evaluator opined that the student's lower scores on form consistency, sequential memory, visual figure ground, and visual closure were "likely a combination of true delayed visual perceptual skills, and visual fatigue/decreasing attention to the task" (id. at p. 9).

The student's communication skills were assessed through the March 2023 speech-language evaluation (Parent Ex. D). Administration of the Clinical Evaluation of Language Fundamentals-Fifth Edition (CELF-5) to the student yielded a core language standard score of 101 (53rd percentile), which was reported to be in the "average range of language functioning," as were the index standard scores (id. at p. 11). The evaluator reported that in addition to formal assessment, she also relied on parent interview, teacher interview, and a "document review" as a component of the evaluation, which showed that "[t]here were expressed concerns" regarding the student's use of language, reading and writing skills, and pragmatic language skills (id. at p. 14). The evaluator concluded that the student demonstrated "average performance in most domains of language functioning"; however, she "presented with delayed pragmatic skills and persistence of phonological processes, primarily fronting /s/ for /sh/ resulting in decreased intelligibility of speech especially as complexity increased" (id.).

The student's communication skills were also assessed during the May 2023 neuropsychological evaluation, and she performed in the "average" range with a summary standard score of 90 (25th percentile) on the Expressive Vocabulary Test-Third Edition, a measure of expressive one word vocabulary (Parent Ex. E at pp. 10, 22). The evaluator assessed the student's receptive language abilities through administration of the Clinical Evaluation of Language Fundamentals Preschool-3 (CELF Preschool-3), on which the student received a scaled score of 3 (1st percentile), and her receptive vocabulary skills through the Peabody Picture Vocabulary Test-Fifth Edition, on which she received a score summary standard score of 63 (1st percentile) (id.). The evaluator found that "[the student] ha[d] many verbal strengths such as social expressions and expressive vocabulary"; however, she had "persistent difficulties with following the rules of conversation and turn taking in conversations," and the evaluator opined that the student's difficulty with following directions, and inferential skills "prevent[ed] her from keeping pace with

13

EXHIBIT C - 13

class lessons and group activities in school" (id. at p. 16).  The evaluator further found that "[o]verall, [the student] [wa]s exhibiting delayed speech and language abilities" and determined that she met the criteria for a diagnosis of unspecified communication disorder (id. at p. 17).

Regarding the student's functioning in social situations, the May 2023 neuropsychological evaluation included results of the Vineland-3 Adaptive Scales (Vineland-3), which reflected that based on parental report, the student had age-appropriate relationships, and appropriately engaged in play and leisure activities, but struggled with using coping skills (Parent Ex. E at pp. 13-14). Administration of the Autism Diagnostic and Observation Schedule, Second Edition (ADOS-2) to the student did not identify any signs or symptoms of autism in either the social affect or restricted and repetitive behaviors domains, and the evaluator found that the student did not meet the criteria for a diagnosis of autism (id. at pp. 9-10).  Nonetheless, the student's SEIT reported that the student sometimes needed prompting to communicate and initiate conversation with peers during free play and group activities (Parent Exs. O at p. 3; S ¶ 18).  The student often "[got] stuck and ha[d] a hard time seeing another's perspective" (Parent Ex. O at p. 3).  The SEIT additionally identified that the student needed 1:1 support during group work to assist the student with turn taking and making requests of peers (id.).

The May 2023 neuropsychological evaluation also included results of the Behavior Assessment System for Children-Third Edition (BASC-3) Parent Rating Scale, which revealed no "elevations on any of the four broad categories, indicating that [the student] exhibit[ed] age-appropriate self-control, and d[id] not act more aggressively, anxious, or depressed compared to other children her age" based on the parents' report (Parent Ex. E at p. 15).  However, the BASC-3 Teacher Rating Scale showed "at-risk elevation" on the behavior symptoms of attention problems and social skills domains, and the evaluator determined that the student met the criteria for a diagnosis of ADHD, inattentive type (id. at pp. 15-16, 18).  The student's difficulty with attention and executive function skills was also noted in both the October 2023 speech-language report and the October 2023 SEIT progress report, which showed that the student struggled to maintain focus and attention in the classroom, was easily distracted, self-directed and needed prompting to follow the group plan, had difficulty with transitions, poor executive function and time management skills, and struggled to follow "basic commands" and daily routines (Parent Exs. M at p. 2; O at p. 1).

### 2. Gesher

Turning to the appropriateness of Gesher, the IHO determined that the hearing record lacked sufficient evidence to determine that Gesher provided the student with instruction specially designed to meet her unique needs.  The IHO pointed out that "[t]he parent[s] failed to provide any testimony from a representative of [Gesher] or provide any evidence that demonstrated that Gesher [wa]s familiar with the [s]tudent and [the student's] needs" (IHO Decision at p. 16).

The student's SEIT, who provided the student's pendency special education services through a private agency, offered testimony about the Gesher program (Parent Ex. S ¶¶ 3, 8).  The SEIT testified that she had worked with the student since November 2020 when the student was three years old (Tr. pp. 60, 66; Parent Ex. S ¶ 8).  According to the SEIT, the student's school day at Gesher was "bifurcated," with instruction provided in Hebrew in the morning and in English in the afternoon (Parent Ex. S ¶ 21).  The SEIT testified that instruction was split between two

14

EXHIBIT C - 14

teachers; each teacher had a master's degree in special education and held New York State certification (id. ¶ 27). According to the SEIT there were 19 students in the student's class, with one teacher and three teaching assistants (id. ¶¶ 28-29).

The SEIT further testified regarding the student's program at Gesher and indicated that in the morning "the student work[ed] on phonetics, following directions, visual coordination, focusing, cutting, executive functioning skills, social [skills], and communication skills" (Parent Ex. S ¶ 22). The SEIT testified that during"[a]lef [b]eis" circle time the student learned the Hebrew alphabet and during "alef [b]eis" centers the student learned how to write Hebrew letters, learned their sounds, and learned words that began with those sounds, and took part in activities involving cutting, pasting, coloring and other fine motor tasks (Tr. pp. 62-63). During afternoon instruction the student "continue[d] to work on letter recognition and formation as well [as] number recognition and formation," and "the class read[] stories, work[ed] on comprehension, cutting, coloring, visual coordination, gross motor skills, social skills and organizational skills" (Parent Ex. S ¶ 23).

Both the SEIT and the parent testified that Gesher used Preventing Academic Failure (PAF), which was, according to the SEIT progress report, an "Orton-Gillingham based program" (Parent Exs. O at p. 1; S ¶¶ 26, 30; T ¶ 27). The SEIT testified that Gesher used Fundations to teach letter and number formation and indicated that "later in the school year" Gesher would use PAF to teach blending of letters and sounds (Parent Ex. S ¶ 26). The parent testified that Gesher also used the Handwriting Without Tears program for writing (Tr. p. 80). The SEIT testified that Gesher "inculcate[d] various educational modalities in its curriculum such as social thinking skills, visual charts, behavior modification, and multi-sensory learning" (Parent Ex. S ¶ 26).

The SEIT testified that she provided the student with four hours of individual SEIT services per week during the 2023-24 school year and worked with the student Monday through Thursday at "the end of the day" from approximately 2:00/2:15 pm to 3:00/3:15 pm (Tr. p. 63; Parent Ex. S ¶¶ 8, 13). She testified that she "push[ed] in for gym," and she "facilitate[d] outdoors when [the student] [wa]s playing with her peers," making sure the student was included in playground games and was an active participant (Tr. pp. 63-64). According to the SEIT, during that time she also worked on "transitioning, building executive functioning skills and 'following the group plan'" (Tr. p. 64; Parent Ex. S ¶ 14). The SEIT additionally testified that after gym she returned to the classroom with the student to review the afternoon visual schedule, check off the completed activities, and participate in a math lesson (Parent Ex. S ¶ 14). Additionally, the SEIT provided "prompting, redirection, broken down instruction and visual support and cueing to allow [the student] to keep up" (Parent Ex. O at p. 1). The SEIT reported that the student benefitted from SEIT-provided "visual schedules for expected routines, positive reinforcement, checks for understanding of complex and multi-step instructions" and "focusing prompts such as tapping, removal of distractions, and extra time on tests" (id.).[11]

---

[11] Although the SEIT testified that she worked with the student from 2:00/2:15-3:00/3:15, which was during gym and math, the October 2023 SEIT progress report contained multiple references to SEIT support provided in other academic classes. For example, the SEIT progress report included the following statements related to SEIT support in reading and writing: "[w]ith SEIT intervention" the student had progressed in her reading skills, she "benefit[ed] from SEIT provided positive reinforcement . . . during reading," and, "[i]n addition to actual writing

EXHIBIT C - 15

Further, the SEIT also documented the student's need for consistent support in the classroom (see Parent Ex. O). The SEIT identified that the student "ha[d] great difficulty functioning in the classroom requiring constant support and redirection to be able to learn and function in the classroom setting as she [wa]s unable to do that on her own," including that she struggled to sustain focus, was easily distracted during learning, had difficulty transitioning throughout the day, exhibited poor executive functioning and time management skills and struggled to keep up with demands and daily routines, and required support to initiate and sustain social interaction with peers (Parent Exs. O at pp. 1-3; S ¶¶ 15, 18-20). The SEIT additionally reported that the student needed modeling and verbal cues to help with writing letters, "prompts and repetition to stay on task," redirection, and positive reinforcement to comply with transitions (Parent Exs. O at pp. 1-3; S ¶¶ 15, 18-20). The October 2023 SEIT progress report identified that the student required "constant 1:1 support and redirection during reading," and "maximal support" when writing, particularly when she did not finish a writing or coloring task before time was up (Parent Ex. O at pp. 1-2). Additionally, when upset and having difficulty transitioning, the student "need[ed] 1:1 support to walk her through with coping and moving on to the next activity" (id.). The SEIT testified that when student did not receive 1:1 instruction, she was less focused on tasks, struggled with transitions, required greater prompting, was easily distracted, and had difficulty complying with demands (Parent Ex. S ¶¶ 24, 37).

The SEIT testified that she collaborated with the student's teachers at Gesher to "see how she was following the routine when [the SEIT] was there as well as throughout the school day" and "shared goals to ensure continuity of instruction and consistency of implementation" (Parent Ex. S ¶¶ 31-32). While the hearing record speaks to the student's performance with her four hours per week of SEIT services, the evidence in the hearing record does not describe how Gesher met the student's needs when the SEIT was not present—which was most of the student's school day— including her need for 1:1 support (see Parent Exs. L-M, O, R-S). Further, in October 2023, the SEIT recommended that the student's SEIT services be increased from four hours per week to three hours per day "to provide her with the required support and instruction she require[d] for prompting, redirection and hand over hand individualized instruction" (Parent Exs. O at p. 3; S ¶ 39).

In light of the above, I find that the hearing record fails to contain sufficient evidence to conclude that Gesher's program was individualized for the student and provided the student with instruction specially designed to meet her unique needs.[12] Accordingly, there is an insufficient basis to overturn the IHO's finding that Gesher was not an appropriate unilateral placement.

---

support and instruction, during writing tasks [the] SEIT praise[d] her and encourage[d] her to do her best," and "provide[d] modeling and hand over hand assistance" (Parent Ex. O at p. 1). The Gesher schedule showed that Fundations circle, Fundations "carryover," and centers occurred between 12:30 and 1:45, which was outside of the timeframe the SEIT testified to providing services to the student (compare Parent Ex. I, with Parent Ex. S ¶ 13). The evidence in the hearing record does not explain how the SEIT addressed the student's reading and writing needs when she provided SEIT services during the student's gym and math instruction time (compare Parent Ex. O at pp. 1-2, with Tr. pp. 63-64, and Parent Ex. I).

[12] To the extent the parents argue that a July 2023 IHO decision arising from a prior matter involving the student, which found Gersher appropriate for the student for the 2022-23 school year, constitutes evidence of Gersher's appropriateness for the 2023-24 school year, such contention is without basis. The prior IHO decision involved

EXHIBIT C - 16

### 3. Vision Therapy Services

The parents contend that the IHO erroneously denied their request for reimbursement of the student's private vision therapy services.  They argue that the student has "visual deficits" that caused her to become "easily frustrated."  The parents also assert that the IHO erred in ordering the CSE to reconvene to determine if vision therapy services were appropriate for the 2023-24 school year.  The district asserts that the due process complaint notice failed to contain an allegation that the lack of vision therapy services constituted a denial of FAPE.[13]  The district further asserts that the IHO should not have ordered the CSE to reconvene to determine the student's need for vision therapy and instead made a finding whether the private vision therapy services were appropriate and whether the parents established a financial obligation for the services.

As discussed above, the evidence in the hearing record provided detailed information pertaining to the student's visual deficits.  Specifically, the March 2023 OT evaluation indicated that the student presented with "significant visual perceptual deficits" (Parent Ex. C at p. 5).  The occupational therapist described in the report that the student's visual fatigue impacted her ability to participate in school (id. at pp. 5-7).  According to the occupational therapist, the student exhibited strengths in "visual discrimination, visual memory, and spatial relationships" with lower scores in "form consistency, sequential memory, visual figure-ground, and visual closure," which she opined were "likely a combination of true delayed visual perceptual skills, and visual fatigue/decreasing attention to the task" (id. at p. 9).  The occupational therapist stated that the student's delayed visual skills would require the student to have frequent breaks, shorter writing assignments, copy of notes at her desk, reduced clutter in her work area, use of raised or bolded line paper for placement when writing, and preferred seating (id. at pp. 9, 18-19).  Similarly, the neuropsychologist testified by affidavit that the student had impaired "visual motor integration abilities" and "performed better with large visual stimuli" (Parent Exs. E at p. 16; Q ¶ 23).

Moreover, the June 2023 IEP referenced the March 2023 OT evaluation finding that the student tilted her head and paper when writing as a result of her visual difficulties (IHO Ex. I at p. 6).  The June 2023 IEP described the parents' concerns regarding the student's visual deficits (id. at pp. 4, 6, 22).  The June 2023 IEP listed certain management needs pertaining to the student's visual needs including visual schedules, visual behavior boards and charts, preferential seating, and visual reminders (id. at pp. 6-7).  The SEIT noted in her progress report that the student required visual support to keep up in the classroom including the use of visual schedules (Parent Exs. O at pp. 1-2; S ¶¶ 14, 26).  The SEIT observed that with respect to reading, tracking was a challenge for the student (Parent Ex. O at p. 1).

---

a different school year and the IHO in that matter had before her a different hearing record and, moreover, the prior decision is not binding on the IHO's or SRO's consideration of the merits of the parents' requested relief pertaining to the 2023-24 school year.

[13] While I agree that the parents did not specifically request reimbursement for vision therapy services in their due process complaint notice, the district did not appear at any of the hearing dates and did not raise this argument within the context of the impartial hearing (see generally Tr. pp. 1-108).

EXHIBIT C - 17

Turning to the parents' request for reimbursement for privately obtained vision therapy, the student's private optometrist also found that the student had "visual perceptual and visual processing" deficits (see generally Parent Ex. B; Parent Ex. R ¶¶ 9-11).  The private optometrist concluded in her direct affidavit testimony that the student's visual diagnoses "significantly impact[ed] her academic success" and specifically in reading and writing (Parent Ex. R ¶ 11).  The private optometrist recommended a program of one 30-minute session per week of vision therapy, with home-based work to complete daily "to remediate the visual conditions discovered during the evaluation" (Parent Exs. B at p. 3; R ¶ 13).  The student began receiving private vision therapy in "winter 2023" and although she had made progress with the vision therapy, she required more support for her visual processing and visual perceptual skills and the private optometrist recommended that services continue during the 2023-24 school year (Parent Exs. R ¶ 13; T ¶ 43).

Despite the information above that described the student's needs and that the vision therapy was needed and benefitted the student, detrimental to the parents' case is the lack of evidence regarding the vision therapy services specifically provided to the student during the 2023-24 school year.  Although the optometrist testified that she provided the student vision therapy (Parent Ex. R ¶ 13), the hearing record lacks any information about the level of services the student received, and does not explain how any services that may have been provided addressed the student's needs (see L.K. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 491 [S.D.N.Y. 2013] [in reviewing the appropriateness of a unilateral placement, courts prefer objective evidence over anecdotal evidence]; L.Q. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 490 [S.D.N.Y. 2013] [rejecting parents' argument that counseling services met student's social/emotional needs where "[t]here was no evidence . . . presented to establish [the counselor's] qualifications, the focus of her therapy, or the type of services provided" and, further, where "[the counselor] did not testify at the hearing and no records were introduced as to the nature of her services or how those services related to [the student's] unique needs"]; R.S. v. Lakeland Cent. Sch. Dist., 2011 WL 1198458, at *5 [S.D.N.Y. Mar. 30, 2011] [rejecting the parents' argument that speech-language therapy services met student's needs where parents "did not offer any evidence as to the qualifications of the provider of the therapy, the focus of the therapy, or when and how much therapy was provided"], aff'd sub nom, 471 Fed. App'x 77 [2d Cir. June 18, 2012]).  Considering the above, the parents did not meet their burden of showing that the vision therapy services provided to the student during the 2023-24 school year were specially designed to meet the student's unique special education needs.

### C. Other Relief

The IHO found that, although the parents failed to meet their burden to prove the appropriateness of the unilateral placement, the student was nonetheless entitled to the related services recommended on the IEP, as well as the additional SEIT, vision therapy, and PT services subject to the review of the CSE (IHO Decision at pp. 8-13).  The IHO ordered the district to reimburse and directly fund the services provided for 2023-24 school year (id. at p. 13).  The district appeals the IHO's findings in this regard.  In addition, the parents assert that the IHO failed to award declaratory relief with respect to the program for the student for the 2023-24 school year.  Specifically, the parents argue that, instead of awarding declaratory relief, the IHO ordered the CSE to reconvene and consider the student's need for vision therapy, additional PT services, and 1:1 SEIT services.  The parents also argue that it was the district's burden to demonstrate the appropriateness of the IEP and, since it did not do so, the parents established the student's need for

EXHIBIT C - 18

the requested services.  As relief, the parents seek a finding that the appropriate program for the student for the 2023-24 school year is placement at Gesher with 12 hours per week of 1:1 SEIT services; one 30-minute session per week of individual vision therapy; two 30-minute sessions per week of individual PT; two 30-minute sessions per week of individual speech-language therapy; and three 30-minute sessions per week of individual OT.

According to the parent, the student received SEIT services, PT, OT, and speech-language therapy from EdZone (Parent Ex. T ¶ 31).  It appears that these services were provided as part of the student's pendency placement (see Interim IHO Decision).  In the interim decision, the IHO found that the student was entitled to pendency consisting of four 60-minute sessions per week of SEIT, two 30-minute sessions per week of 1:1 speech-language therapy, three 30-minute sessions per week of 1:1 OT, and two 30-minute sessions per week of 1:1 PT (id.).  The IHO's interim decision is silent as to delivery of the services.  According to the parents, the student's pendency thereafter changed due to an IHO decision in their favor, entitling the student to additional relief under pendency.

Given the IHO's pendency order, some of the student's services have apparently been funded by the district as part of the student's stay put placement during the pendency of the proceedings and, as a result, the parent was not required to incur any financial responsibility because the district was required to bear costs under the provisions of the IDEA.[14]

For any services that have been delivered or will be delivered beyond those funded pursuant to pendency, the district is correct that the parents have not demonstrated a financial obligation and, therefore, is not entitled to the services as a form of direct funding or reimbursement relief under the Burlington/Carter framework.

To the extent the IHO's order for district funding of the services could be deemed an award for compensatory education, I do not find the hearing record supports such an award as a means to supplement the parents' unilateral placement of the student at Gersh.  Similarly, the "declaratory relief" requested by the parents encompasses both the program the parents obtained for the student at Gesher and additional services sought by the parents.  Accordingly, the parents request for declaratory relief appears to be an attempt to obtain the requested relief for tuition reimbursement at Gesher, without having the burden of proving its appropriateness for the student.  The Second Circuit's approach to compensatory education thus far may have left room for unique circumstances where an award of compensatory education may be warranted where, for example, a student is unilaterally placed but the parent's request for tuition reimbursement is denied under a Burlington/Carter analysis (see Application of a Student with a Disability, Appeal No. 16-050), or

---

[14] When a student is receiving services pursuant to pendency, the district is obligated to deliver or fund those services and a parent is not required to show a financial obligation for services the district was required to fund (see Application of a Student with a Disability, Appeal No. 22-177 [parent did not have to provide proof of a financial obligation to support request for funding of ABA services for remainder of school year at issue when those services had been delivered to student through pendency for a portion of the school year]; Application of a Student with a Disability, Appeal No. 21-245 [in discussing services delivered to the student under pendency, it was determined that there was no remaining dispute as to the provision of, or payment for the services already provided to the student under pendency]; Application of a Student with a Disability, Appeal No. 20-042 [discussion of rate for services only addressed services provided prior to the commencement of pendency, after which point district was obligated for payment]).

EXHIBIT C - 19

where a student is unilaterally placed but additional related services were required in order for the placement to provide the student with a FAPE (see V.W. v. New York City Dep't of Educ., 2022 WL 3448096, at *5–7 [S.D.N.Y. Aug. 17, 2022] [finding that awards of tuition reimbursement and compensatory education are not mutually exclusive and that an award of "both education placement and additional services may be necessary to provide a particular student with a FAPE"]). One court has recently endorsed a combined award of tuition reimbursement and compensatory education based on a denial of FAPE for the same time period (V.W., 2022 WL 3448096, at *5-*6). To the extent this blended approach is adopted, it then begins to blur the parents' responsibility in the hearing process to establish that the unilateral services they obtained for their child were reasonably calculated to enable the student to receive educational benefits in light of the child's circumstances, because it calls on school districts to simultaneously become responsible to correct the shortcomings or defects of a unilateral placement with compensatory education.[15]  I am not convinced that is what the Second Circuit intended in its approach on this topic thus far and analyzing relief in the manner requested by the parents would make it impossible to effectively differentiate the burden of proof with respect to the unilateral placement that has been placed on parents and the burden of proof with respect to compensatory education.

Accordingly, under the circumstances presented here, where the parents have failed in their burden of proving the appropriateness of Gesher, rather than attempting to craft compensatory education or prospective relief for the student based on a placement that has already been found inappropriate, a direction for the CSE to further consider the student's need for all of the services preferred by the parents on a going forward basis is a more proper outcome (see Adams v. Dist. of Columbia, 285 F. Supp. 3d 381, 393, 396-97 [D.D.C. 2018] [noting with approval the hearing officer's finding "that the directives of IDEA would be best effectuated by ordering an IEP review and revision, rather than prospective placement in a private school"]; see also Student X v. New York City Dep't of Educ., 2008 WL 4890440, at *16 [E.D.N.Y. Oct. 30, 2008] [noting that "services found to be appropriate for a student during one school year are not necessarily appropriate for the student during a subsequent school year"]).  In the event that the parents disagree with the recommended programming, the parents may challenge that in a new impartial hearing.

## VII. Conclusion

Having determined that the parents failed to establish the appropriateness of the student's unilateral placement at Gesher or the appropriateness of unilaterally-obtained vision therapy services for the 2023-24 school year, the necessary inquiry is at an end and there is no need to reach the issue of whether equitable considerations support an award of tuition reimbursement (see M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d Cir. 2000]).  The IHO erred in ordering the

---

[15] As the Supreme Court explained, "when a public school system has defaulted on its obligations under the Act, a private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits'"; thus, the Rowley/Endrew F. standard shifts to parents when unilateral placements are involved, albeit with a "totality of the circumstances" test in the words of the Second Circuit or "all relevant factors" element in the words of the Supreme Court (Carter, 510 U.S. at 11, 16; Frank G. v. 459 F.3d at 364).

EXHIBIT C - 20

district to fund related services beyond those it was required to provide or fund pursuant to pendency.  Further, the parents are not entitled to the declaratory relief sought.

I have considered the remaining contentions and find it is unnecessary to address them in light of my determinations above.

**THE APPEAL IS DISMISSED.**

**THE CROSS-APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**IT IS ORDERED** that the IHO's decision, dated December 11, 2023, is modified by reversing those portions which ordered the district to fund speech-language therapy, PT, and OT services beyond those which the district was required to fund pursuant to pendency and ordered the district to fund vision therapy delivered during the 2023-24 school year based on the determinations of the CSE reconvened pursuant to the order.

**Dated:**     **Albany, New York**
            **April 10, 2024**                    _____
                                                **SARAH L. HARRINGTON**
                                                **STATE REVIEW OFFICER**

EXHIBIT C - 21